**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ERIC PICA, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>vs.<br><br>BARNES & NOBLE COLLEGE BOOKSELLERS, LLC; BARNES & NOBLE EDUCATION, INC.; CENGAGE LEARNING, INC.; FOLLETT HIGHER EDUCATION GROUP; MCGRAW HILL LLC; and PEARSON EDUCATION, INC.,<br><br>                Defendants. | CIVIL ACTION NO.<br><br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION COMPLAINT |

### CLASS ACTION COMPLAINT

1.     The Defendants, the dominant publishers of college textbooks and dominant retail chains operating on-campus college bookstores, entered into the "Inclusive Access" conspiracy described herein in order to monopolize the market for sales of course materials in any courses and on any colleges in which the Inclusive Access policy applies.  Inclusive Access requires students to obtain their course materials only in an online format and only from their official on-campus bookstore, and not from any other source, thereby preventing the Defendants from facing competition from new print textbooks, used print textbooks, and other online sources, and also from off-campus and online bookstores and sellers.  Defendants' monopolizing the market for the sale of course materials in Inclusive Access courses has allowed them to charge higher prices for those course materials with no legitimate justification, to the detriment of college and graduate students.

1

2.     Inclusive Access increases students' costs and eliminates their choices in order to increase the profits of textbook publishers and on-campus college bookstore retail chains.  As one recent analysis found, "[p]hrases like 'inclusive access' may sound great for students. In reality, publishers reap the benefits while students have fewer options than ever to save money.  These programs create a virtual monopoly, undercutting academic freedom and low-cost options."

3.     Plaintiff Eric Pica ("Plaintiff"), brings this action on behalf of himself and all others similarly situated against the three dominant publishers of college and graduate school textbooks, Cengage Learning, Inc. ("Cengage"), McGraw Hill LLC ("McGraw"), and Pearson Education, Inc. ("Pearson," collectively, the "Publisher Defendants"), and against the two dominant operators of official on-campus bookstores, Barnes & Noble College Booksellers, LLC and Barnes & Noble Education, Inc. (collectively, "B&N"), and Follett Higher Education Group, Inc. ("Follett", collectively with B&N the "Retailer Defendants").

4.     Student loan debt has become a crisis in the United States.  Forty-five million Americans have student loans.  Total student loan debt is now over $1.5 trillion dollars and exceeds the total debt owed for auto loans or credit cards.  College graduates in 2017 owed an average of $28,650 in student loan debt.

5.     One factor contributing to the rise of student loan debt is the high cost of textbooks and other course materials.  According to the College Board, the average college student spends $1,200 per year on textbooks and course materials.

6.     Until recently, college and graduate students had increasing numbers of options for purchasing textbooks, including official on-campus bookstores, off-campus bookstores in their colleges' communities, mail-order from out-of-state bookstores, and online bookstores or sellers, including sites like Amazon and Chegg, or sellers found on eBay and Craigslist.  Students also had

the option of purchasing new print versions of textbooks, used print versions, or electronic versions. The growing availability of these varied options of sellers and textbook formats increased competition, reduced textbook prices, and saved students money, but resulted in decreased profits for the Publisher Defendants and Retailer Defendants.

7.      The Publisher Defendants and Retailer Defendants responded to this threat to their profits through the "Inclusive Access" conspiracy described herein. Instead of students being instructed to buy a specific textbook for a class, from any source and in any format (e.g. "Biochemistry, J. Berg, 8th edition"), students in an Inclusive Access course are required to pay for electronic access to the textbook, at the designated price, from their own official on-campus bookstore.

8.      The Publisher Defendants use Inclusive Access to require every student in an Inclusive Access course to pay for electronic access to the course textbook. Without Inclusive Access, many students would purchase a used version of the textbook on the secondary market, and the Publisher Defendants would not receive any money from those sales.

9.      The Retailer Defendants, who run a majority of all official on-campus college bookstores in the United States, use Inclusive Access to require students to make the Inclusive Access textbook purchases from their own on-campus bookstore. Without Inclusive Access, students could buy print or electronic textbooks from competing sources, and the Retailer Defendants would not receive any money from those sales.

10.      The Publisher Defendants refuse to sell Inclusive Access materials to any retailers other than official on-campus bookstores. If off-campus and online retailers were allowed to sell Inclusive Access materials to students, that competition would reduce prices. This exclusionary policy prevents competition and keeps prices high.

11.    Students effectively have no other choice than to purchase Inclusive Access materials at the designated price from their official on-campus bookstore.  Reading assignments, homework problems, and quizzes are part of the official Inclusive Access materials, and so while students can technically "opt-out" of the purchase under federal law, a student who does so would be at a massive disadvantage due to not being able to access those required course materials.  Many colleges require a student who opts out to show proof of purchasing the materials from another source (and as mentioned above, they are generally not available from other sources).

12.    At many colleges using Inclusive Access, students in Inclusive Access courses are automatically signed up for the Inclusive Access materials and automatically charged for them on their tuition bills.

13.    Inclusive Access does not have any advantages for students.  Students pay higher prices, are forced to purchase electronic materials even if they prefer print, and they receive access to online materials with an expiration date as opposed to being able to save course materials for future reference or sell them for money after the class is over.  Instructors have to waste class time explaining how to use the online materials, and technical problems or broken Internet connections can result in students losing access to the materials.

14.    The Publisher Defendants and Retailer Defendants' actions in conspiring to create the Inclusive Access system, requiring students to purchase Inclusive Access from only their official on-campus bookstores, and refusing to sell Inclusive Access materials to other retailers, all in order to monopolize the market for textbooks in Inclusive Access classes and thereby raise prices, are actionable violations of the federal antitrust laws.  Plaintiff seeks treble damages and injunctive relief, demanding a trial by jury of all issues so triable, under Sections 1 and 2 of the

Sherman Act (15 U.S.C. §§ 1 and 2), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

15.     Plaintiff alleges the following based upon personal knowledge as to matters relating to herself and upon information and belief and based on the investigation of counsel as to all other matters:

## JURISDICTION AND VENUE

16.     Plaintiff brings claims under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, seeking treble damages pursuant to Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, and injunctive relief pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26. This Court has subject matter jurisdiction over the Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1337(a).

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claims herein occurred in this District, and in the alternative, under 28 U.S.C. § 1391(b)(3), as this court would have personal jurisdiction over Pearson and B&N, who are inhabitants of, and transact business in, this District.

18.     This Court has personal jurisdiction over each Defendant on several grounds: (1) Defendants Pearson and B&N have their principal places of business in, and transact substantial business in, New Jersey, (2) Defendants Cengage, McGraw, and Follett all transact substantial business in New Jersey, (3) Defendants Cengage, McGraw, and Follett herein all conspired with New Jersey-based Defendants Pearson and B&N, and (4) Defendants committed acts in furtherance of the conspiracy throughout the United States and in New Jersey, including establishing Inclusive Access programs at New Jersey universities.

## INTERSTATE COMMERCE

19.     Defendants' actions have had a significant effect on interstate commerce in the college textbook field.

20.     B&N has on-campus college bookstores in 43 states.  On information and belief, B&N sells Inclusive Access to students in all 43 of those states.

21.     Follett has on-campus college bookstores in 48 states.  On information and belief, Follett sells Inclusive Access to students in all 48 of those states.

22.     Cengage, McGraw, and Pearson sell textbooks and course materials through Inclusive Access to students in all 50 states.

23.     The conspiracy herein had a substantial effect on the national market for college textbooks, including the national market for college textbooks subject to Inclusive Access programs.

## PARTIES

24.     Plaintiff Eric Pica is a resident of Essex County, Massachusetts. During the relevant time period, he was required to purchase and did purchase college textbooks and course materials through Inclusive Access directly from one or more of the Defendants.

25.     Defendant Barnes & Noble Education, Inc. is a Delaware corporation based in Basking Ridge, NJ that was spun off from Barnes & Noble, Inc. in 2015, and that is the parent company of Barnes & Noble College Booksellers, LLC.

26.     Defendant Barnes & Noble College Booksellers, LLC is a Delaware LLC based in Basking Ridge, NJ that operates Barnes & Noble's campus bookstores nationwide and that sells Inclusive Access materials through those bookstores.

27.     Defendant Follett Higher Education Group is an Illinois corporation based in Westchester, IL that operates Follett's campus bookstores nationwide and that sells Inclusive Access materials through those bookstores.

28.     Defendant Cengage Learning, Inc. is a Delaware corporation based in Boston, MA that publishes college textbooks and course materials, including through Inclusive Access.

29.     Defendant McGraw Hill LLC is a Delaware LLC based in New York, NY that publishes college textbooks and course materials, including through Inclusive Access.

30.     Defendant Pearson Education, Inc. is a Delaware corporation based in Upper Saddle River, NJ that publishes college textbooks and course materials, including through Inclusive Access.

## CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) as representatives of a Class defined as follows:

> All students at colleges or graduate schools in the United States who were required to purchase textbooks or course materials through Inclusive Access. Excluded from the Class are Defendants and their employees.

32.     The members of the Class are so numerous that joinder is impracticable. There are at least hundreds of thousands if not millions of college students who were required to purchase textbooks and other course materials from the Defendants under Inclusive Access plans.

33.     There are numerous questions of law and fact that are common to the Class and that predominate over any issues affecting individual members of the Class, including, *inter alia*:

a.     Whether the Publisher Defendants and Retailer Defendants colluded to create, promote, and maintain the Inclusive Access system;

b.      Whether the Publisher Defendants colluded with college-run campus bookstores to create, promote, and maintain the Inclusive Access system on those campuses;

c.      Whether the Publisher Defendants colluded among themselves to fix and raise the price of textbooks and course materials under the Inclusive Access system;

d.      Whether the Publisher Defendants refused to deal with independent retailers who sought to sell Inclusive Access materials;

e.      The time period, number of universities, and number of students affected by the Inclusive Access system;

f.      Whether the Publisher Defendants had market power in the market for college textbooks and course materials subject to Inclusive Access;

g.      Whether the Publisher Defendants substantially foreclosed competition in the market for college textbooks and course materials subject to Inclusive Access;

h.      Whether the Retailer Defendants had monopoly power in the market for college textbooks and course materials subject to Inclusive Access on the campuses in which they operate official on-campus bookstores;

i.      Whether Inclusive Access has a legitimate pro-competitive justification;

j.      Whether Plaintiff and the Class suffered injury as a result of the Defendants' actions, and if so, the extent of those damages;

k.      Whether the conduct alleged herein has artificially maintained, preserved, or enhanced the Publisher Defendants' market power in the market for college textbooks and course materials subject to Inclusive Access;

l.      Whether the conduct alleged herein has artificially maintained, preserved, or enhanced the Retailer Defendants' monopoly power in the market for college textbooks and course materials subject to Inclusive Access on the campuses in which they operate official on-campus bookstores;

m.      Whether the actions of the Publisher Defendants as described herein were a violation of the Sherman Act;

n.      Whether the actions of the Retailer Defendants as described herein were a violation of the Sherman Act;

o.      The operative time period and extent of Defendants' antitrust violations;

p.      The appropriate injunctive and equitable relief for the Class; and

q.      The appropriate measure of damages for the Class.

34.      Plaintiff's interests are typical of, and not antagonistic to, those of other or absent members of the Class, such that he can fairly and adequately represent and protect their interests.

35.      Plaintiff has retained counsel with substantial experience litigating complex antitrust class actions.

36.      If individual Class members prosecuted many separate actions, there would be a risk that the outcomes of those actions would be inconsistent with one another.

37.      Class treatment of Plaintiff's federal antitrust claims is a superior method for the fair and efficient adjudication of this controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

38.    The Class is ascertainable in that the Retailer Defendants would have records of the students who were required to purchase textbooks and course materials subject to Inclusive Access on the campus bookstores that they operate, and college-run bookstores with Inclusive Access would have similar records.

39.    Class treatment would allow Class members who have comparatively small claims to prosecute those claims, instead of finding it uneconomical to do so.

40.    Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## FACTUAL ALLEGATIONS

41.    Prior to Inclusive Access, students who needed higher education textbooks and course materials ("textbooks") could choose from print or electronic textbooks.  This allows students to use the method that better fits their own learning style; some students prefer to work from a print textbook while others prefer a digital version.

42.    Prior to Inclusive Access, students who needed textbooks could purchase from a primary or secondary market.  Students can purchase a new print textbook or electronic textbook, or they can purchase a used one.  When students buy print textbooks, they have the option to sell the print textbook at the end of a semester, or to keep it for future reference.

43.    Prior to Inclusive Access, students who needed textbooks could purchase from many possible sources, including official on-campus bookstores, off-campus bookstores in their colleges' communities, out-of-state bookstores through mail order, and online bookstores or sellers, including sites like Amazon and Chegg, or sellers found on eBay and Craigslist.

44.    The Publisher Defendants have a market share of approximately 80-90% in the primary market for textbooks.

45.     The Retailer Defendants run the majority of official on-campus bookstores in the United States, and nearly two-thirds of college and graduate students in the United States attend institutions where a Retailer Defendant operates the on-campus bookstore.

46.     In recent years, the amount of money that the Retailer Defendants pay to operate a college's official bookstore has risen considerably, and it can reach millions of dollars for the largest colleges.  This reflects the profitability of Inclusive Access to the Retailer Defendants.

47.     There is competition among participants in the retail market for textbooks in courses that are not subject to Inclusive Access, including on-campus bookstores (whether run by the Retailer Defendants or the colleges themselves), off-campus bookstores, out-of-state bookstores, and online bookstores and sellers.  This competition forces competitors to reduce prices and improve service and selection in order to compete.

48.     While students purchase and use the textbooks, the decision of which textbook will be used in any particular class is up to the professor, his or her department, and/or the university itself.  Students are required to buy that textbook in order to do the readings and complete the assignments for that particular class, and there is no alternative option.

49.     Publishers market their textbooks heavily to professors (such as in academic journals and at academic conferences), to departments, and to universities so that they will select that publisher's textbook instead of alternatives.

50.     The Defendants formed and operated trade associations that functioned to effectuate the conspiracies described herein.

51.     The Publisher Defendants formed Educational Publishers Enforcement Group ("EPEG") in 2016.  The supposed purpose of EPEG was to work against textbook counterfeiting, but it in fact functions to allow the Publisher Defendants to communicate with one another in order

to collude in imposing Inclusive Access, and to impose pretextual anti-counterfeiting policies that actually serve to restrict competition for textbooks. All three Publisher Defendants are members of EPEG and have been part of it since its inception.

52.     EPEG created what it alleged were anti-counterfeiting practices called the EPEG Guidelines, but those EPEG Guidelines in fact serve to limit which retailers are allowed to sell textbooks in order to limit supply to enable the Publishers to have a captive market and charge higher prices. EPEG created a "white list" of acceptable retailers, and encouraged its members to refuse to sell to anyone not on the white list as a means of reducing competition from off-campus and online sellers, despite the fact that the vast majority of those sellers were simply selling used textbooks and were not engaged in counterfeiting.

53.     The National Association of Collegiate Stores (NACS) was a trade association that formerly allowed any textbook retailers to participate, including both the Retailer Defendants and other retailers. The Publisher Defendants would participate in NACS events as non-voting members, further enabling their collusion with the Retailer Defendants. On April 1, 2019, NACS voted to exclude all textbook retailers that do not operate on-campus stores, removing retailers other than the Retailer Defendants and stores that are operated by the institutions themselves. This has allowed NACS to function in furtherance of collusion rather than as a legitimate trade association representing the interests of all textbook retailers as a class.

54.     Prior to Inclusive Access and the conspiracy alleged herein, student spending on textbooks had declined considerably as students had access to many alternatives to the purchase of new print or electronic textbooks from official on-campus stores, including used textbooks or purchasing from alternative retail options such as off-campus bookstores or online bookstores or sellers.

55.    From 1997 to 2007, university bookstores sold used books at an average of just under 75% of the new textbook price due to contract constraints requiring used book pricing to be no higher than 75% of the new book price.  A 2015 study found that used textbook prices on sites like Amazon.com averaged 58% of the price of new textbooks.  One study also found that this more open competition, while decreasing prices for students, has also decreased the profits of the Publisher Defendants, which increased the Publisher Defendants' incentive to try to marginalize or eliminate the secondary market.

56.    As shown in the graph below, overall student spending on textbooks has been steadily declining as a result of this increased competition.



57.    In addition, that competition also helped to restrain price increases for new textbooks from on-campus stores.  As shown in the graph below, the price of new textbooks has been stagnant since 2016.



**CPI for All Urban Consumers (CPI-U)**

Series Id:      CUUR0000SSEA011
Not Seasonally Adjusted
Series Title:   College textbooks in U.S. city average, all urban consumers, not seasonally adjusted
Area:           U.S. city average
Item:           College textbooks
Base Period:    DECEMBER 2001=100

58.     This increased competition caused the Publisher Defendants and Retailer Defendants to experience a significant decrease in their profits.

59.     The Publisher Defendants and Retailer Defendants responded to this decrease in their profits caused by competition by creating and implementing the Inclusive Access system to exclude competition and raise prices.  Defendants' Inclusive Access scheme, as described herein, has allowed them to arrest the decline in profits resulting from these trends of declining student spending on textbooks and stagnant new textbook prices that both resulted from increased competition, and instead allowed them to preserve and increase their profits in the growing Inclusive Access sector by monopolizing the market for Inclusive Access textbooks and charging supracompetitive prices for those textbooks.

60.     Under Inclusive Access, students receive access to the online version of the textbook, the access expires after the semester is over, and the cost is often billed directly to a student's tuition bill.  This can be arranged only through the official campus bookstore, whether run by a Retailer Defendant or directly by the college.  Students are normally unable to purchase the Inclusive Access materials from any other source, because the Publisher Defendants refuse to sell them to off-campus bookstores or online bookstores.

61.    Students are effectively required to purchase the Inclusive Access materials in order to obtain necessary reading assignments and homework problems in order to pass the course.

62.    Students are often automatically subscribed to Inclusive Access materials and are automatically billed for them on their tuition bills.  While students technically have the legal right to opt-out of purchasing Inclusive Access materials, those materials are not available from other sources, and so a student who opts out of purchasing them would not be able to do necessary reading assignments and homework problems and would be at a major disadvantage in the class, if not unable to pass the class at all.  In some cases, a student who opts out is required to certify that they will purchase the Inclusive Access materials elsewhere, even though they are usually not available from other sources.

63.    The effect of Inclusive Access is to exclude any competition for textbook purchases by eliminating the secondary market and eliminating other sources for students to purchase the Inclusive Access textbooks – students' only option is mandated purchases of Inclusive Access materials from the Publisher Defendants and (at the majority of campuses where Retailer Defendants operate the official on-campus bookstore) the Retailer Defendants.

64.    Economists have shown that in other industries, eliminating a secondary market can increase the profits of the firms who produce the primary product by 50% or more.  One study found that the Publisher Defendants' profits would increase by 42.6% if they could close down the secondary market.

65.    On many campuses where the official on-campus bookstore is run by a Retailer Defendant, Inclusive Access is an exclusive arrangement between the Publisher Defendants, the Retailer Defendant, and the university.  These arrangements are set forth in license agreements between each Publisher Defendant, the Retailer Defendant, and the university that set forth that

the Publisher Defendant will only sell Inclusive Access materials at that university through the Retailer Defendant that operates the official on-campus bookstore. These license agreements are nearly identical to one another, further evidence of collusion between Defendants to impose the Inclusive Access program.

66.     There are also direct exclusivity agreements between each Publisher Defendant and each Retailer Defendant, which are operative when there isn't a license agreement involving a university where the Retailer Defendant operates, that also set forth that the Publisher Defendant will not sell Inclusive Access materials to retailers other than the Retailer Defendant on the campuses where it operates. This allows for even more rapid expansion of the Inclusive Access system, since it doesn't require a formal license agreement to be executed with each university.

67.     On campuses where the official on-campus bookstore is run by the university itself, Inclusive Access is an exclusive arrangement between the Publisher Defendants and the university.

68.     When a college first adopts Inclusive Access, it normally begins with a few courses as a trial, but then expands to far more courses and students, starting with the introductory-level courses with the largest enrollments.

69.     When retailers other than the Retailer Defendants or on-campus bookstores run by universities have approached the Publisher Defendants and asked to purchase Inclusive Access materials to sell to students, they were refused. The Publisher Defendants either stated that they had an exclusive arrangement with the Retailer Defendant or college-run on-campus store, or that the Inclusive Access materials could not be made available in a format that would allow those off-campus or online retailers to resell them.

70.     The Publisher Defendants refused to sell Inclusive Access materials to off-campus retailers in numerous college communities, including retailers near Dona Ana Community College,

Eastern Kentucky University, the University of New Mexico, New Mexico State University, the University of North Texas, and the University of Texas Arlington that sought to sell Inclusive Access materials for those colleges.

71.    In the few instances where the Publisher Defendants did sell Inclusive Access materials to off-campus retailers, often only after legal intervention, the materials were sold at a substantially higher price than they were sold to the Retailer Defendants or to college-run on-campus bookstores.  This resulted in the off-campus retailers being unable to sell the materials at a competitive price and unable to compete with the Retailer Defendants or college-run on-campus bookstores for sales.

72.    The Publisher Defendants and Retailer Defendants claim that Inclusive Access has technological advantages, but in reality, it simply offers the same textbooks and course materials that were offered before, but in a restricted electronic-only format, and with time-limited access. In addition to being more expensive, it also does not allow students who learn better from a print format to use print.  Students also cannot keep the materials for future reference, to help them in future classes and in their careers.  In STEM fields especially, upper-level classes often build on the knowledge gained in lower-level classes, and students may often need to refer back to earlier material to fully understand the new material.

73.    Inclusive Access can require professors to spend class time explaining how to use the system, and students can be cut off from the materials when there are technical problems or when they don't have Internet access, both problems that don't exist with standard textbooks.

74.    A study by the Tennessee Board of Regents comparing student performance before and after the use of Inclusive Access found that the percentage of students who obtained a grade of at least "C" actually declined in a majority of courses after switching to Inclusive Access.

75.     The Publisher Defendants have also justified Inclusive Access by claiming that the cost to students is lower.  However, while the cost may in some cases be lower than the list price of new versions of the Inclusive Access textbooks (which is set by the Publisher Defendants and can be artificially inflated to make it appear that Inclusive Access is a bargain), it is far higher than the price that would exist in the event of open competition from used books, off-campus retailers, and online retailers and sellers.

76.     As an example, at UCLA, the Inclusive Access price of N. Gregory Mankiw's *Principles of Economics* is $108.98.  The same textbook can be rented for $34.51 on Amazon or Chegg.  Mankiw is estimated to have made $42 million in royalties from his textbook, illustrating the profitability of a best-selling textbook title such as many of those in the Inclusive Access system.

77.     Additionally, production costs are far lower for digital versions of books than for physical versions, and so with open competition the cost of electronic versions of textbooks would be lower still.  For Barnes and Noble Education, gross margins in its digital segment are over 80% as compared to 20% in its standard retail segment, which includes college bookstore sales of physical textbooks.

78.     The Publisher Defendants' executives have stated their intention to eliminate the used book market.  Cengage CEO Michael Hansen agreed in an interview that his goal is to rid the industry of the used textbook market.  McGraw-Hill CEO Nana Banerjee stated: "[a]nd there is a half-life that is associated with kind of taking out this used secondary market book enterprise that really has been a disruptor for us."

**RELEVANT MARKET**

79.     Plaintiff alleges that Defendants' conduct was *per se* illegal: the Publisher

18

Defendants and Retailer Defendants (1) colluded to establish and operate the Inclusive Access system in order to restrict the supply of textbooks and monopolize the market for textbooks so that they could raise prices, and (2) have effectively established a group boycott to prevent Inclusive Access materials from being sold through any other sources.  However, to the extent that Plaintiff's claims must proceed under the rule of reason or otherwise require the definition of a relevant market, Plaintiff will do so here.

80.     The relevant product market for the purposes of the antitrust claims in this action is the market for textbooks and course materials for courses subject to Inclusive Access (the "Inclusive Access Market").

81.     The Inclusive Access conspiracy by Defendants seeks to use Inclusive Access to eliminate competition from new textbooks, used textbooks, and other electronic versions of textbooks, and from other online and physical textbook sellers.

82.     On information and belief, the Publisher Defendants have a market share of over 90% in the Inclusive Access Market.

83.     While a student is required to purchase an ordinary textbook, the price of used and electronic versions of that textbook does constrain the price of new textbooks, and the availability of multiple sellers for any given textbook constrains the ability of an official on-campus bookstore to raise prices.

84.     The Inclusive Access Market is a product market consisting only of Inclusive Access textbooks.  There are no substitutes for Inclusive Access textbooks.  The availability of new or used textbooks does not constrain the price of Inclusive Access textbooks, because students are not allowed to use those textbooks in place of the Inclusive Access textbooks.  Inclusive Access textbooks can only be purchased from official on-campus retailers, whether run by the Retailer

Defendants or by a college itself. Inclusive Access textbooks are generally not available from any other source, or in the rare instances when they are, they are more expensive. Therefore, the isolated availability of Inclusive Access textbooks from other sources does not constrain their price from official on-campus retailers.

85.    At all relevant times, the Publisher Defendants had substantial market power in the Inclusive Access Market. The Publisher Defendants had the power to maintain the price of Inclusive Access materials at supracompetitive levels, and to do so profitably without losing substantial sales.

86.    The relevant geographic market is the United States. The relevant geographic submarkets are the markets for Inclusive Access textbooks at each individual university. Students at one university cannot purchase Inclusive Access textbooks from other universities, and generally cannot purchase them from other sources at all other than their own on-campus bookstore, or in the rare instances when they are available elsewhere, they are more expensive. Therefore, the official on-campus bookstore, whether run by a Retailer Defendant or by a college itself, has an effective total monopoly on the Inclusive Access Market on its own college.

87.    At all relevant times, the Retailer Defendants had substantial market power in the Inclusive Access Market at all colleges in which they operate official on-campus bookstores that have Inclusive Access programs. The Retailer Defendants had the power to maintain the price of Inclusive Access materials on those campuses at supracompetitive levels, and to do so profitably without losing substantial sales.

88.    The Retailer Defendants have over a 50% market share in the percentage of official on-campus bookstores that they operate, and they serve nearly two-thirds of the nation's college

and graduate students, and therefore have a very high market share in the overall Inclusive Access Market.

89.    The Inclusive Access Market is susceptible to collusion due to a small number of dominant publishers, the monopoly position of on-campus bookstores, the captive market of students who need the Inclusive Access textbooks to pass their classes, and high barriers to entry due to Publisher Defendants' and Retailer Defendants' longstanding relationships with textbook authors, professors assigning textbooks, and universities.

90.    If the Defendants' actions are not enjoined, the Inclusive Access Market is likely to take over more and more college textbook and course materials sales, resulting in higher prices and reduced choice for more students on more campuses and in more of their courses.

## ANTITRUST INJURY

91.    At colleges that use Inclusive Access whose bookstores are run by the Retailer Defendants, the Publisher Defendants and Retailer Defendants' actions have forced Plaintiff and Class members to purchase Inclusive Access textbooks from only the Retailer Defendants, causing them to pay higher prices than if the textbooks were available in multiple formats and from different sources, including the secondary market.

92.    At colleges that use Inclusive Access whose bookstores are college-run, the Publisher Defendants' actions have forced Class members to purchase Inclusive Access textbooks from only their official college-run bookstore, causing them to pay higher prices than if the textbooks were available in multiple formats and from different sources, including the secondary market.

93.    Without Inclusive Access, Plaintiff and other Class members would have many options to purchase textbooks, including new and used versions of print textbooks and electronic versions of textbooks, and purchasing from on-campus bookstores, off-campus bookstores, and

online sources, including the secondary market, and competition between those options would result in lower prices.

94.     This has injured Plaintiff and other Class members and they have suffered antitrust injury as a result.

## FRAUDULENT CONCEALMENT

95.     The Defendants concealed their conspiracy from Plaintiff and other members of the Class.  The Defendants' actions in developing and implementing the Inclusive Access conspiracy occurred in private communications, including through trade associations that claimed publicly to have other purposes.  The Defendants' public statements promoted Inclusive Access to students and universities as being a technological advance, being cheaper, or being a response to consumer demand, not as a conspiracy to raise prices and increase profits by eliminating competition.

96.     Plaintiff and other members of the Class did not have access to information that would have alerted them to the possibility of the conspiracy between the Publisher Defendants and Retailer Defendants.  A college student instructed that the textbook for a certain course would only be available through Inclusive Access would not reasonably suspect that it was the result of a conspiracy to increase profits by eliminating competition at the students' expense.

97.     In light of the above, the Publisher Defendants and Retailer Defendants' knowing and active efforts to conceal the conspiracy and the conduct behind it should be deemed to toll any statute of limitations herein, and to estop Defendants from using any statute of limitations defense in this action.

## CAUSES OF ACTION

### COUNT ONE
### Unlawful agreement to restrain trade (15 U.S.C. § 1)

98.    Plaintiff repeats and reiterates each of the allegations contained in the paragraphs above as if fully set forth herein.

99.    The Publisher Defendants colluded to restrain trade in textbooks through the Inclusive Access conspiracy described herein: (1) working with the Retailer Defendants and college-run bookstores to impose Inclusive Access, (2) arranging to have universities mandate the purchase of Inclusive Access textbooks by students, (3) arranging to have universities prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (4) refusing to sell Inclusive Access textbooks to retailers other than official on-campus bookstores, whether run by the Retailer Defendants or by colleges themselves, including by imposing pretextual anti-counterfeiting standards, all with the intention of eliminating competition and raising prices by establishing a captive market for textbooks through Inclusive Access.

100.    The Retailer Defendants colluded to restrain trade in textbooks on the universities on which they operate official on-campus bookstores through the Inclusive Access conspiracy described herein: (1) working with the Publisher Defendants and universities to impose Inclusive Access, (2) arranging to have universities mandate the purchase of Inclusive Access textbooks by students, and (3) arranging to have universities prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, all with the intention of eliminating competition and raising prices by establishing a captive market for textbooks through Inclusive Access.

101.    As a result of the Publisher Defendants and Retailer Defendants' Inclusive Access conspiracy as described herein, Plaintiff and other Class members have had to pay higher prices for textbooks as a result of the elimination of competition, and it has therefore caused them injury.

23

102.    Plaintiff and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## COUNT TWO
### Monopolization (15 U.S.C. § 2)

103.    Plaintiff repeat and reiterate each of the allegations contained in the paragraphs above as if fully set forth herein.

104.    In the market for Inclusive Access textbooks at each individual university that uses Inclusive Access, the Publisher Defendants (and the Retailer Defendants at universities where they run the official on-campus bookstore) have monopoly power, and acquired that power willfully through the conspiracy described herein rather than through any technological advantages from, or consumer demand for, Inclusive Access.

105.    In the market for Inclusive Access textbooks at each individual university that uses Inclusive Access, at universities at which a Retailer Defendant runs the official on-campus bookstore, the Publisher Defendants and Retailer Defendants acquired their monopoly power through anticompetitive and exclusionary means: (1) arranging to have the university mandate that students purchase Inclusive Access textbooks and purchase them only from the Retailer Defendant who runs the official on-campus bookstore, (2) arranging to have the university prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (3) the Publisher Defendants refusing to sell Inclusive Access textbooks to retailers other than the official on-campus bookstore run by the Retailer Defendant, including by imposing pretextual anti-counterfeiting standards.

106.    In the market for Inclusive Access textbooks at each individual university that uses Inclusive Access, at universities where the university runs the official on-campus bookstore, the Publisher Defendants acquired their monopoly power through anticompetitive and exclusionary

means: (1) arranging to have the university mandate that students purchase Inclusive Access textbooks and purchase them only from the official on-campus bookstore, (2) arranging to have the university prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (3) refusing to sell Inclusive Access textbooks to retailers other than the official on-campus bookstore, including by imposing pretextual anti-counterfeiting standards.

107.    These actions by the Publisher Defendants and Retailer Defendants have served to create and maintain their monopoly for Inclusive Access textbooks at each such university, in violation of 15 U.S.C. §2.

108.    The Publisher Defendants and Retailer Defendants' violation of 15 U.S.C. §2 has caused injury to Plaintiff and other Class members by forcing them to pay higher prices for textbooks than they would pay in a competitive market for textbooks in the absence of Defendants' anticompetitive Inclusive Access practices.

109.    Plaintiff and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## COUNT THREE
### Attempted Monopolization (15 U.S.C. § 2)

110.    Plaintiff repeats and reiterates each of the allegations contained in the paragraphs above as if fully set forth herein.

111.    In the market for Inclusive Access textbooks at each individual university that uses Inclusive Access, the Publisher Defendants (and the Retailer Defendants at universities where they run the official on-campus bookstore) engaged in predatory and anticompetitive conduct with the specific intent of monopolizing that market, and with a dangerous probability of monopolizing that market.

112.     In the market for Inclusive Access textbooks at each individual university that uses Inclusive Access, at universities at which a Retailer Defendant runs the official on-campus bookstore, the Publisher Defendants and Retailer Defendants engaged in the following anticompetitive and exclusionary conduct with the specific intent of monopolizing the market: (1) arranging to have the university mandate that students purchase Inclusive Access textbooks and purchase them only from the Retailer Defendant who runs the official on-campus bookstore, (2) arranging to have the university prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (3) the Publisher Defendants refusing to sell Inclusive Access textbooks to retailers other than the official on-campus bookstore run by the Retailer Defendant, including by imposing pretextual anti-counterfeiting standards.

113.     In the market for Inclusive Access textbooks at each individual university that uses Inclusive Access, at universities where the university runs the official on-campus bookstore, the Publisher Defendants engaged in the following anticompetitive and exclusionary conduct with the specific intent of monopolizing the market: (1) arranging to have the university mandate that students purchase Inclusive Access textbooks and purchase them only from the official on-campus bookstore, (2) arranging to have the university prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (3) refusing to sell Inclusive Access textbooks to retailers other than the official on-campus bookstore, including by imposing pretextual anti-counterfeiting standards.

114.     There is a dangerous probability that the Publisher Defendants' conduct will in fact monopolize the market for Inclusive Access textbooks at universities that use Inclusive Access, and that the Retailer Defendants' conduct will in fact monopolize the market for Inclusive Access

textbooks at the universities at which they operate the official on-campus bookstores, since through these policies they have excluded all other possible competition from that market.

115.    These actions by the Publisher Defendants (and Retailer Defendants where applicable) are attempted monopolization of the market for Inclusive Access textbooks at each such university, in violation of 15 U.S.C. § 2.

116.    The Publisher Defendants and Retailer Defendants' violation of 15 U.S.C. § 2 has caused injury to Plaintiff and other Class members by forcing them to pay higher prices for textbooks than they would pay in a competitive market for textbooks in the absence of Defendants' anticompetitive Inclusive Access practices.

117.    Plaintiff and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## COUNT FOUR
## Conspiracy to Monopolize (15 U.S.C. § 2)

118.    Plaintiff repeats and reiterates each of the allegations contained in the paragraphs above as if fully set forth herein.

119.    The Publisher Defendants colluded to restrain trade in textbooks through the Inclusive Access conspiracy described herein, with the specific intent to monopolize the market for Inclusive Access textbooks: (1) working with the Retailer Defendants and college-run bookstores to impose Inclusive Access, (2) arranging to have universities mandate the purchase of Inclusive Access textbooks by students, (3) arranging to have universities prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, and (4) refusing to sell Inclusive Access textbooks to retailers other than official on-campus bookstores, whether run by the Retailer Defendants or by colleges themselves, including by imposing pretextual anti-

counterfeiting standards, all with the intention of eliminating competition and raising prices by establishing a captive market for textbooks through Inclusive Access.

120.    The Retailer Defendants colluded to restrain trade in textbooks on the universities on which they operate official on-campus bookstores through the Inclusive Access conspiracy described herein, with the specific intent to monopolize the market for Inclusive Access textbooks on those universities: (1) working with the Publisher Defendants and universities to impose Inclusive Access, (2) arranging to have universities mandate the purchase of Inclusive Access textbooks by students, and (3) arranging to have universities prohibit the use of non-Inclusive Access textbooks by students in Inclusive Access courses, all with the intention of eliminating competition and raising prices by establishing a captive market for textbooks through Inclusive Access.

121.    The Publisher Defendants and Retailer Defendants committed overt acts in furtherance of the conspiracy alleged herein, including entering into exclusivity agreements between Publisher Defendants, Retailer Defendants, and universities, between Publisher Defendants and Retailer Defendants, and between Publisher Defendants and universities.

122.    These actions by the Publisher Defendants (and Retailer Defendants where applicable) are a conspiracy to monopolize the market for Inclusive Access textbooks at each such university, in violation of 15 U.S.C. § 2.

123.    The Publisher Defendants and Retailer Defendants' conspiracy to monopolize the market for Inclusive Access textbooks at each such university in violation of 15 U.S.C. § 2 has caused injury to Plaintiff and other Class members by forcing them to pay higher prices for textbooks than they would pay in a competitive market for textbooks in the absence of Defendants' anticompetitive Inclusive Access practices.

124.    Plaintiff and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

**WHEREFORE, Plaintiff demands a trial by jury and hereby respectfully requests:**

(a)    That the Court determine that Plaintiff's claim regarding the Class alleged herein is suitable for class treatment and certify the proposed Class pursuant to Fed. R. Civ. P. 23;

(b)    That the Court appoint Plaintiff as the representative of the Class;

(c)    That Plaintiff's counsel be appointed as counsel for the Class;

(d)    That the Court award, pursuant to 15 U.S.C. § 15, compensatory and trebled damages to the Class resulting from Defendants' violations of the Sherman Act;

(e)    That the Court order, pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing Defendants from continuing their unlawful acts in violation of the Sherman Act;

(f)    That Plaintiff and the Class be awarded their costs, expenses, and reasonable attorney's fees in bringing this action;

(g)    That Plaintiff and the Class be awarded pre-judgment and post-judgment interest on all sums awarded; and

(h)    Such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues properly triable to a jury in this case.

Dated:  April 22, 2020                                  Respectfully submitted,

*/s/ Lee Albert*
Lee Albert  (ID # LA8307)
Brian Murray (*pro hac vice* to be filed)
Brian D. Brooks (*pro hac vice* to be filed)
**GLANCY PRONGAY & MURRAY LLP**
230 Park Avenue, Suite 530
New York, NY 10169
Telephone:     (212) 682-5340
Facsimile:      (212) 884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com
bbrooks@glancylaw.com